UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
March 23, 2010
MAR 2 3 2010
JUDGE AMY ST. EVE
United States District Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 122 |
| vs. | ) | |
| | ) | Hon. Amy St. Eve |
| HOWARD BLANKENSHIP, | ) | United States District Court Judge |
| also known as "Fats" | ) | |

## PLEA AGREEMENT

1.    This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant HOWARD BLANKENSHIP, also known as "Fats," and his attorney, MARY JUDGE, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(B) as more fully set forth below.  The parties to this Agreement have agreed upon the following:

### Charge in This Case

2.    The indictment in this case charges defendant with conspiring to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely 5 kilograms or more of mixtures and substances containing cocaine, and 50 grams or more of mixtures and substances containing cocaine base in the form of crack cocaine, both Schedule II Narcotic Drug Controlled Substances, in violation of Title 21, United States Code, Section 846.

3.    Defendant has read the charge against him contained in the indictment, and that charge has been fully explained to him by his attorney.

4.    Defendant fully understands the nature and elements of the crime with which he has been charged.

### Charge to Which Defendant is Pleading Guilty

5.    By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the indictment.  Count One charges defendant with conspiracy to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely 5 kilograms or more of mixtures and substances containing cocaine, and 50 grams or more of mixtures and substances containing cocaine base in the form of crack cocaine, both Schedule II Narcotic Drug Controlled Substances, in violation of Title 21, United States Code, Section 846.  In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

### Factual Basis

6.    Defendant will plead guilty because he is in fact guilty of the charge contained in the indictment.  In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt:

Beginning no later than in or about January 2007, and continuing until at least on or about February 12, 2008, at Joliet, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant HOWARD BLANKENSHIP ("BLANKENSHIP") co-defendants Barry Ware, aka "B," "Buckethead," "Beanhead, "Sweet Nuts," and "Penelope," Gregorio Rodriguez, aka "George," Gary McDonald, aka "Worm," Devon Tyler, aka "D," Gerald

Lindsey, Kevin Waddell, aka "KK," "Benny," and "Soda Pop," Terry Peten, aka "T" and "Marv," Melvin Holmes, Jermaine McCann, Bobby Mitchell, aka "Mitch," Laquinta Moffett, aka "LuLu," "Big Girl," and "Quinta," Linnea Massey, aka "Nay Nay," and with others known and unknown, knowingly and intentionally to possess with intent to distribute and to distribute controlled substances, namely 5 kilograms or more of mixtures and substances containing cocaine, and 50 grams or more of mixtures and substances containing cocaine base in the form of crack cocaine (hereinafter referred to as "crack cocaine"), both Schedule II Narcotic Drug Controlled Substances, in violation of Title 21, United States Code, Section 846.

More specifically, Ware directed Melvin Holmes and Laquinta Moffett to regularly distribute wholesale quantities of cocaine and crack cocaine to Joliet-based customers, including BLANKENSHIP, for resale to others. Ware commonly "fronted" the cocaine and crack cocaine to BLANKENSHIP, meaning the cocaine was provided to him with the understanding that he would make a complete payment for the cocaine after he resold it.

From approximately December 2006 to approximately November 2007, WARE fronted BLANKENSHIP approximately, one ounce to two ounces of crack cocaine once every two weeks. WARE typically charged BLANKENSHIP $600 per ounce of crack cocaine.

BLANKENSHP sold this crack cocaine to various individuals, including an individual who, unbeknownst to BLANKENSHIP, was working with law enforcement as a cooperating

3

source (hereinafter referred to as "CS-2"). Specifically, on or about February 20, 2007, in the afternoon, CS-2 received an incoming call from BLANKENSHIP. During this call, CS-2 told BLANKENSHIP that CS-2 wanted to "come full circle on that thing we talked about." BLANKENSHIP understood CS-2 to be referring to a purchase of crack cocaine. CS-2 told BLANKENSHIP that CS-2 needed to borrow a car, and that CS-2 would call BLANKENSHIP back after CS-2 got the car.

Later that afternoon, CS-2 received an incoming telephone call from BLANKENSHIP. During this call, CS-2 told BLANKENSHIP that CS-2 had borrowed a car and the two agreed to meet at a location near BLANKENSHIP's mother's house located at 816 N. Center Street, Joliet, Illinois.

At approximately 4:15 p.m. that evening, while enroute to the previously agreed upon meeting location, CS-2 received an incoming call from BLANKENSHIP. BLANKENSHIP instructed CS-2 to meet BLANKENSHIP at the Citgo gas station, located at 609 Ruby Street, Joliet, Illinois.

Minutes later, CS-2 pulled into the parking lot of the Citgo gas station, exited CS-2's vehicle and enter the front passenger seat of a small blue Chevy 4-door sedan driven by BLANKENSHIP. During this meeting, BLANKENSHIP sold CS-2 approximately one ounce of crack cocaine (26.9 grams) in exchange for $700 and agreed that CS-2 would owe BLANKENSHIP an additional $200 as a result of the transaction. BLANKENSHIP received the crack cocaine that BLANKENSHIP sold to CS-2 from WARE.

During the conspiracy, the amount of crack cocaine distributed that BLANKENSHIP was personally involved with or which was reasonably foreseeable to BLANKENSHIP was at least approximately 591 grams to at least approximately 1144 grams.

7.     Defendant disclosed the following self-incriminating information to the government pursuant to the terms of a proffer agreement dated March 25, 2008. Pursuant to Guideline §1B1.8(a), this information may not be used in determining the applicable guideline range for defendant:

In approximately 1996, Ware provided BLANKENSHIP with an ounce of powder cocaine. BLANKENSHIP sold the powder cocaine and provided the money to Ware. Ware then gave BLANKENSHIP two and one quarter ounces of powder cocaine. BLANKENSHIP "broke-up" the two and one quarter ounces into "eights" (one-eighth ounce quantities) and sold them.

BLANKENSHIP received at least two and one quarter ounces of cocaine from Ware once a week from 1996 until Ware was imprisoned sometime in or around 1998. This quantity was the minimum that BLANKENSHIP would receive from Ware and, on numerous occasions during this time period, BLANKENSHIP received four and one half and nine ounce quantities of powder cocaine from Ware.

When Ware was released from prison sometime in or around 2001, Ware began selling crack cocaine. Ware provided BLANKENSHIP with two and one quarter ounces of crack cocaine, once a week, until BLANKENSHIP was imprisoned in 2004. Following

BLANKENSHIP's arrest in 2004, BLANKENSHIP had WARE sell two of BLANKENSHIP's vehicles for $5,000. WARE then "flipped" (profited through drug sales) that money into $10,000 for BLANKENSHIP's bond. When BLANKENSHIP was released on bond, BLANKENSHIP received one ounce of crack cocaine from Ware. From BLANKENSHIP's release from custody on bond until BLANKENSHIP's incarceration in September 2005, BLANKENSHIP obtained various quantities of crack cocaine from Ware on a weekly basis. Ware often provided BLANKENSHIP with two and one quarter ounce or four and one quarter ounce quantities of crack cocaine. On one occasion during this time period, Ware provided BLANKENSHIP with three and one quarter ounce quantities of crack cocaine.

In December 2006, after BLANKENSHIP was again released from a period of incarceration, BLANKENSHIP met with Ware and began obtaining crack cocaine from Ware. BLANKENSHIP continually increased the amounts of crack cocaine BLANKENSHIP would obtain from Ware. BLANKENSHIP obtained two and one-quarter quantities of crack cocaine, then four and one quarter quantities of crack cocaine, then "half-bird" (one half kilogram) quantities of crack cocaine from Ware.

In the several months leading up to Ware and BLANKENSHIP's arrest in the present case, BLANKENSHIP typically called Ware on telephone number (815) 823-6171. Ware's drug weights were typically accurate and that Ware typically provided the drugs in a paper bag that contained a plastic bag that contained the cocaine.

6

In addition, BLANKENSHIP previously asked Ware to show BLANKENSHIP how to "cook" powder cocaine into crack cocaine. In response, Ware advised that it would cost money for Ware to teach BLANKENSHIP how to cook the powder cocaine into crack cocaine.

Further, BLANKENSHIP is aware that Ware has several sources of supply for cocaine. BLANKENSHIP is aware that one source was a Mexican male named "George" that was arrested as part of the present case (Gregorio Rodriguez). Ware previously told BLANKENSHIP that "George" was Ware's source of supply for cocaine.

BLANKENSHIP was aware that Ware potentially also received cocaine from another individual known only to BLANKENSHIP as "George."

Regarding co-defendant Melvin Holmes, BLANKENSHIP has known Holmes to deal in illegal drugs. Sometime in 1999, BLANKENSHIP received three "sticks" of heroin from another individual, BLANKENSHIP paid $10,000 for one of the sticks and the other individual "fronted" the other two sticks to BLANKENSHIP, who in turn gave the sticks to Holmes to sell. Holmes did not pay BLANKENSHIP for the three sticks of heroin.

Regarding co-defendant Kevin Waddell, BLANKENSHIP has known Waddell to be involved in narcotics trafficking and BLANKENSHIP used to sell cocaine to Waddell. BLANKENSHIP is aware that, in the last several years, Waddell began making large sums of money from the sale of cocaine. On various occasions in 2007, BLANKENSHIP obtained one ounce quantities of powder cocaine from Waddell. Unlike WARE, Waddell always required

7

payment up-front for the narcotics Waddell was providing.   BLANKENSHIP typically obtained powder cocaine from Waddell, but BLANKENSHIP is aware that Waddell dealt in crack cocaine as well.

8.   The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

## Maximum Statutory Penalties

9.   Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.   A maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 10 years.  Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense.  This offense also carries a maximum fine of $4,000,000.  Defendant further understands that the judge also must impose a term of supervised release of at least five years up to and including any number of years, including life.

b.   In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

8

## Sentencing Guidelines Calculations

10.  Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines.  Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11.  For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.  **Applicable Guidelines**.  The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing.  The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2009 Guidelines Manual.

b.  **Offense Level Calculations.**

i.  The base offense level for the Count in the indictment is 34, pursuant to Guideline §2D1.1(c)(3), because the amount of controlled substances involved in the offense for which defendant is accountable is more than 500 grams but less than 1.5 kilograms of cocaine base in the form of crack cocaine.

ii.  Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct.  If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline §3E1.1(a), including

by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

       iii.    In accord with Guideline §3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.  Therefore, as provided by Guideline §3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

       c.    **Criminal History Category.**  With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal at least eleven and defendant's criminal history category is V:

       i.    On or about December 16, 1991, defendant was convicted of Aggravated Battery with a Firearm in the Circuit Court of Will County and sentenced to 12 years' incarceration.  Pursuant to Guideline § 4A1.1(a), defendant receives three criminal history points for this conviction.

       ii.    On or about January 10, 2001, defendant was convicted of Possession of a Controlled Substance in the Circuit Court of Will County and sentenced to

12 months' supervision.  Pursuant to Guideline § 4A1.1(c), defendant receives one criminal history point for this conviction.

        iii.    On or about May 2, 2002, defendant was convicted of Possession of a Controlled Substance in the Circuit Court of Will County and sentenced to 12 months' conditional discharge.  Pursuant to Guideline § 4A1.1(c), defendant receives one criminal history point for this conviction.

        iv.    On or about September 13, 2005, defendant was convicted of Burglary in the Circuit Court of Will County, in case number 03 CF 588, and sentenced to four years' incarceration.  Pursuant to Guideline § 4A1.1(a), defendant receives three criminal history points for this conviction.

        v.    Defendant committed the instant offenses while under criminal justice sentences, namely a term of parole arising from the conviction described in subparagraph 11(c)(iv) above. Pursuant to Guideline § 4A1.1(d), the defendant receives two criminal history points.

        vi.    Defendant committed the instant offenses less than two years after release from imprisonment on a sentence counted under § 4A1.1(a).  Namely, the sentence described in subparagraph 11(c)(iv) above.  Pursuant to Guideline § 4A1.1(e), the defendant receives one criminal history point.

        d.    **Anticipated Advisory Sentencing Guidelines Range.**  Therefore, based on the facts now known to the government, the anticipated offense level is 31, which,

when combined with the anticipated criminal history category of V, results in an anticipated advisory Sentencing Guidelines range of 168 to 210 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. Defendant also acknowledges that he is subject to a statutory minimum sentence of 10 years' imprisonment.

e.      Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.      Both parties expressly acknowledge that this plea agreement is not governed by Fed.R.Crim.P. 11(c)(1)(C), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines.

The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

### Cooperation

12.     Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois.  This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding.  Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

### Agreements Relating to Sentencing

13.     At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this plea agreement, then the government shall move the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), if applicable,  to depart from the applicable Guideline range and statutory minimum sentence, and shall recommend a sentence that includes a term of imprisonment in the custody of the Bureau of Prisons of 66% of the low end of the applicable Guideline range or 66% of the statutory minimum sentence, whichever is greater.  Defendant shall be free to recommend whatever sentence he deems appropriate. Defendant understands that the

13

decision to depart from the applicable advisory guidelines range and statutory minimum sentence, if it applies, rests solely with the Court. If the Court determines that the sentence should be reduced in light of the disparity between the offense levels for crack and powder cocaine, the government will not object to a reasonable additional adjustment on that basis. Should the Court choose to make such an adjustment based on the disparity between the offense levels for crack and powder cocaine, however, the government will object to any sentence that is below the number of months equal to 66% of the low end of the advisory Guidelines range that would apply if the crack cocaine quantity were treated as powder cocaine.

14.     If the government does not move the Court, pursuant to Sentencing Guideline §5K1.1 and 18 U.S.C. § 3553(e), to depart from the applicable Guideline range and the statutory minimum sentence, as set forth above, this plea agreement will not be governed, in any part, by Federal Rule of Criminal Procedure 11(c)(1)(C), the preceding paragraph of this plea agreement will be inoperative, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines, and the statutory minimum sentence without any downward departure for cooperation pursuant to §5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Sentencing Guideline §5K1.1 and 18 U.S.C. § 3553(e).

15.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

16.     The government agrees not to file an information against defendant pursuant to Title 21, United States Code, Section 851 seeking enhancement of defendant's sentence on the basis of a prior conviction for a felony drug offense.

17.     After sentence has been imposed on the count to which defendant pleads guilty, the government will move to dismiss the forfeiture allegation as to this defendant.

### Presentence Investigation Report/Post-Sentence Supervision

18.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charge against him, and related matters.  The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of defendant's cooperation.

19.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer.  Defendant understands that providing false or incomplete information, or

15

refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline §3E1.1 and enhancement of his sentence for obstruction of justice under Guideline §3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

20.   For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced.  Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

21.   This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 08 CR 122.

22.     This Plea Agreement concerns criminal liability only.  Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity.  The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

23.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.     **Trial rights.**  Defendant has the right to persist in a plea of not guilty to the charge against him, and if he does, he would have the right to a public and speedy trial.

i.     The trial could be either a jury trial or a trial by the judge sitting without a jury.  Defendant has a right to a jury trial.  However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random.  Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where

17

actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.    If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt. The jury would have to agree unanimously before it could return a verdict of guilty or not guilty.

iv.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.    At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.    At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.   At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify.  If defendant desired to do so, he could testify in his own behalf.

b.   **Waiver of appellate and collateral rights.**  Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed.  Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Sentencing Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Plea Agreement.  In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, and (in any case in which the term of imprisonment and fine are within the maximums provided by statute) his attorney's alleged failure or refusal to  file a notice of appeal, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. Finally, if the Court imposes a term of imprisonment that is at or below the number of months that equals 66% of the low-end of the advisory

19

Guidelines range that would apply if the crack cocaine quantity were treated as powder cocaine, defendant waives his right to subsequently seek a reduction of sentence based directly on a change in the law as it relates to the crack cocaine/powder disparity that may be applicable to defendant, even if the change in the law is made retroactive by an Act of Congress, by the Supreme Court, or by the United States Sentencing Commission acting pursuant to Title 18, United States Code, Section 3582(c)(2) or pursuant to any other authority.  The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

      c.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs.  Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Other Terms

24.    Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

### Conclusion

25.    Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

26.    Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term

of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

27.    Defendant understands that his compliance with each part of the Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute

defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

28.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

29.    Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney.  Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _3/23/2010._

PATRICK J. FITZGERALD
United States Attorney

HOWARD BLANKENSHIP
Defendant

TINOS DIAMANTATOS
Assistant U.S. Attorney

MARY JUDGE
Attorney for Defendant